UNITED STATES BANKRUPTCY COURT                      FOR PUBLICATION

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DELTA AIR LINES, *et al.*, | : | Case No. 05 B 17923 (ASH) (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| DELTA AIR LINES, INC., *et al.*, | : | |
| Plaintiffs, | : | |
| -against- | : | Adv. Proc. No. 06-1259A |
| DAVID L. BIBB, Acting Administrator of General Services Administration, GENERAL SERVICES ADMINISTRATION, and UNITED STATES OF AMERICA, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL**
**Attorneys for Debtors/Plaintiffs**
**By: Marshall Scott Huebner, Esq.**
    **Benjamin S. Kaminetzky, Esq.**
**450 Lexington Avenue**
**New York, NY 10038**

**J. SCOTT McCLAIN, ESQ.**
**Assistant General Counsel**
**Delta Air Lines, Inc.**
**Law Department**
**Atlanta, GA 30320**

**U.S. ATTORNEY'S OFFICE**
**SOUTHERN DISTRICT OF NEW YORK**
**Attorneys for Defendants**
**By: Pierre G. Armand, Esq.**
    **Assistant U. S. Attorney**
**86 Chambers Street, 3rd Floor**
**New York, NY 10007**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**DECISION ON RIGHT TO OFFSET**

Delta Air Lines, Inc. ("Delta" or the "Debtor") commenced this adversary proceeding for declaratory judgment that the Government Services Administration (the "Government") is precluded from deducting amounts the Government "overpaid" to Delta for services purchased pre-petition from amounts which the Government owes to Delta for services purchased post-petition. It is Delta's position that, like other creditors, the Government is prohibited by the automatic stay provisions in Sections 362(a)(3) and (6) of the Bankruptcy Code from collecting its pre-petition claims against Delta by offset against its liability to Delta on post-petition transactions. The Government asserts that it is entitled to the offset (i) because the Transportation Payment Act, 31 U.S.C. § 3726, requires calculation of its post-petition obligations net of its pre-petition claims and (ii) under the equitable doctrine of recoupment.

The parties agree that there are no factual issues requiring a trial and have made cross-motions for summary judgment. On the uncontested facts, I conclude as a matter of law that the Government is not entitled to set off its pre-petition claims against its post-petition liabilities.

## Jurisdiction

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the standing order of referral of cases to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.

## The Facts

Each year, Delta provides air transportation to hundreds of thousands of government employees traveling on official business throughout the world, and each year the government pays Delta hundreds of millions of dollars for tickets for these transportation services. Since 2000 the Government has purchased over $3 billion of air travel from Delta.

**Annual "City Pair" Contracts**

Each year the Government solicits bids from airlines seeking to provide transportation services to the Government under so-called "City Pair Contracts" under which the contracting airline

provides transportation between certain named cities at agreed prices. The Government uses a computer program to analyze the prices bid and services proffered by each competing airline and awards "city pairs" to the airline with the highest score on flights between two named cities. The airline awarded a particular city pair receives all of the Government's business for transportation between that city pair that qualifies for the City Pair Contract fare, unless that airline's flight schedule does not meet the specified travel requirements of the individual traveler or is sold out.

City Pair Contracts are one year in length, running from October 1 through September 30 (the Government's fiscal year) and include options by the Government to extend the contract for a maximum of three months. Each City Pair Contract between an airline and the Government is the result of a complex process, involving a "pre-pre-solicitation meeting," a "pre-solicitation meeting" generally held in January or February, negotiations before and after these meetings, the preparation of contractual terms for each annual City Pair Contract, solicitations to eligible carriers, submission of bids by the eligible carriers and the award of each city pair to a single carrier for that year. As a result of this process, the airline servicing any particular city pair can change from year to year, with new terms, conditions, awards and fares, to take effect on October 1 each year. The many changes to contractual terms on a yearly basis as a result of this process include such matters as code-sharing, payment methods, pricing and the inclusion of fuel surcharges in pricing, the size of a group traveling together that is entitled and required to use the fares awarded and contract extensions.

Delta has entered into separate City Pair Contracts with the Government each year from 1981 through 2005, all of which were different and all of which have expired.

Pursuant to the complex process referred to above, Delta and the Government entered into the 2006 City Pair Contract under which Delta agreed to provide air transportation between certain pair cities under agreed-upon terms, conditions and prices. The 2006 City Pair Contract was at the time of trial an executory contract which provided that beginning October 1, 2005 (two weeks after Delta's Chapter 11 filing) and continuing through September 30, 2006 Delta would provide air transportation to eligible travelers between the included city pairs at the agreed prices. The 2006 Delta City Pair Contract

awarded Delta 680 city pairs (by contrast, the 2001 Delta City Pair Contract awarded Delta 1,067 city pairs).

**Two Methods of Payments — Credit Card and GTR**

To be eligible to travel on a City Pair Contract fare, a traveler must be a Government employee, traveling on Government business, and using an approved form of payment.  Although the City Pair Contracts are negotiated and executed centrally by the General Services Administration, individual government agencies remunerate for transportation purchased by the agency pursuant to the City Pair Contracts.  Transportation provided pursuant to a City Pair Contract can be paid for by one of two methods — credit card or Government Travel Request ("GTR").

The primary method by which federal agencies and their employees pay airlines like Delta is by Government-issued Visa or MasterCard credit cards ("Government travel card") under a program called "Smartpay."  Government employees are generally required to use the Government travel cards to pay for official travel expenses.   The bank or charge card company pays Delta and the bill goes to the governmental agency in the case of a centrally billed account, or to the employee in the case of an individually billed account.  If the employee pays the bill, the Government reimburses its employee.  The bank or charge card company may or may not pay Delta before the services are rendered, but the parties agree that Delta is generally paid for tickets purchased by Government travel card before any Government audit is conducted.

While the great majority of Government employee travel is purchased and paid for using Government travel cards, a small portion of Government travel generally if not exclusively limited to the military is purchased using GTRs.  GTRs are documents created by military personnel to resemble tickets and include the date and place of issue, the passenger's name, the issuing Government officer's name, rank and signature, the origin and destination of travel and the applicable fare.  GTRs are provided to named individuals and exchanged at outside travel agencies for tickets.  The GTRs are collected by the

travel agents and sent to Delta in bulk, which processes the GTRs and creates a GTR-specific invoice which is provided to the Government agency that purchased the travel.

The GTR invoices which are created by Delta and sent with the applicable GTRs to the Army or other military component which ordered the GTRs are forwarded to the National Travel Service, Inc., a contractor employed by the General Services Administration to audit the GTR invoices and underlying GTRs. National Travel Service, Inc. audits the invoices, either approves or declines payment and forwards the invoices to the Defense Finance and Accounting Service ("DFAS"). If payment is approved, Delta receives an Advice of Payment ("AOP") from DFAS and generally receives payment by wire transfer within a day or two of receiving the AOP. As a consequence of this procedure, no Government travel by GTR is paid for until after review and approval by Government audit.

**The Origin of this Controversy**

During March 2003 through January 2004, pursuant to a Congressional directive, the Government's General Accountability Office ("GAO") conducted an audit of airline tickets purchased by the Department of Defense ("DOD") during and after 2000 to determine whether and to what extent airline tickets that DOD purchased through the centrally-billed charge card account were unused and not refunded. The GAO report, issued in March 2004, found that during the fiscal years 2001 and 2002 DOD had purchased and paid Delta over $26.2 million for expired airline tickets during the 2001 and 2002 fiscal years that were fully or partially unused, and that the Government has never received a refund for the value of these tickets.[1] For convenience, the $26.2 million (or such other figure as may be determined) will be referred to hereinafter as the "2001-2002 Overpayment" or the "Refund Claim."

As previously noted, GTR travel by Government employees is not paid until after audit by or on behalf of the Government. Thus, amounts owed to Delta by the Government for GTR travel pre-petition and post-petition are due and owing. Following the GAO audit report and the determination of

---

[1] The substance of this sentence is not disputed, although there may be a dispute as to the value or amount of the expired, unrefunded, fully or partially unused tickets.

- 5 -

the 2001-2002 Overpayment, the Government demanded that Delta promptly refund the Overpayment and that, "unless these amounts were promptly refunded to the United States Treasury," the Government would deduct the 2001-2002 Overpayment (arising from Government employee travel using credit cards) from the amounts owed to Delta pre-petition and post-petition in respect to Government employee travel tickets purchased by GTRs.

### The Legal Issue in this Proceeding

Delta has acknowledged that the Government has the right to offset an appropriate portion of the 2001-2002 Overpayment against the Government's indebtedness to Delta on account of GTR travel services provided pre-petition under the setoff provisions of Section 553 of the Bankruptcy Code, since the Government's claim against and obligation to Delta both arose pre-petition.

The dispute here concerns the Government's asserted right to deduct its refund claim based on the 2001-2002 Overpayment from amounts which have long since been calculated and which the Government indisputably owes to Delta in respect of GTR travel services provided to Government employees post-petition.

### Discussion

**A.      The automatic stay**

The automatic stay is one of the most fundamental debtor protections in the Bankruptcy Code. *Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986) (quotation omitted); *Eastern Refractories Co., Inc. v. Forty Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d Cir. 1998); *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

The automatic stay is crucial for the benefit and protection of creditors and the central bankruptcy objective of equal treatment of creditors.

> [T]he filing of a bankruptcy petition, voluntary or involuntary, under any one of the several available chapters of the Code, automatically stays the secured creditor's power to foreclose upon the collateral. Thus the Code's automatic stay confers a considerable boon upon the debtor. The stay is also regarded as a source of "creditor protection," since without it creditors would race each other to achieve preferment through litigation,

> and "[b]ankruptcy is designed to provide an orderly procedure under which all creditors are treated equally."

*LNC Investments, Inc. v. First Fidelity Bank*, 247 B.R. 38, 43-44 (S.D.N.Y. 2000) (citation omitted).

> "The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that."

*Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994) (quoting H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 54-55 (1978), U.S.Code Cong. & Admin.News 1928, pp. 5787, 6297); *In re Harris*, 62 B.R. 391, 394 (Bankr. E.D. Mich. 1986) ("[I]t is fundamental to the operation of the Code that creditors of an equal status—e.g. priority, administrative and unsecured—be treated equally and equitably.") (citations omitted).

The automatic stay applies to the Government, just as it applies to other creditors. *See University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1074 (3d Cir. 1992) ("In drafting the Bankruptcy Code, Congress subjected the government, acting as creditor, to the limitations of the automatic stay provision."). *See also Lincoln Savings Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Association, Inc.)*, 880 F.2d 1540, 1545 (2d Cir. 1989) (Bankruptcy Code "requires that all creditors, both public and private, be subject to the automatic stay"), *cert. denied sub nom. Suffolk County Treasurer v. Barr*, 493 U.S. 1058 (1990); *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 394 (D.C. Cir. 1997) ("[T]he government as a contracting party is generally subject to the automatic stay"); *NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.)*, 235 B.R. 263, 269 (Bankr. S.D.N.Y. 1998) ("[A]s recognized by the FCC . . . , the FCC *in its capacity* as a creditor is subject to the Bankruptcy Code including the automatic stay") (emphasis in original), *aff'd*, *NextWave Personal Communications, Inc. v. FCC*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd*, *FCC v. NextWave Personal Communications, Inc. (In re NextWave*

*Personal Communications, Inc.)*, 200 F.3d 43 (2d Cir. 1999), *cert. denied*, 531 U.S. 1029 (2000).[2] *See also NLRB v. 15th Avenue Iron Works, Inc.*, 964 F.2d 1336, 1337 (2d Cir. 1992); *Matter of Fugazy Exp., Inc.*, 114 B.R. 865 (Bankr. S.D.N.Y. 1990), *aff'd*, 124 B.R. 426 (S.D.N.Y. 1991), *appeal dismissed*, 982 F.2d 769 (2d Cir. 1992), *motion to vacate denied*, 159 B.R. 432 (Bankr. S.D.N.Y. 1993), *leave to appeal denied*, 163 B.R. 434 (S.D.N.Y. 1994).

It is clear that, absent some statutory or judicially created exemption for the Government, the automatic stay precludes the Government from deducting its Refund Claim against Delta based on the 2001-2002 Overpayment from its liability to Delta on account of post-petition GTR travel. Delta correctly points out, and the Government does not dispute, that such a deduction would violate the automatic stay in subsections (3) and (6) of Section 362(a), which prohibit

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; [and]
>
> (6) any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title. . . .

The stay violation is not overcome by Section 553, which permits setoff only of mutual pre-petition debts and obligations.

The Government predicates its purported right to deduct the pre-petition 2001-2002 Overpayment from its post-petition obligation to pay Delta for GTR travel on two separate arguments.

First, relying on case law interpreting unique provisions of the Medicare statute, and implementing regulations, the Government argues that a single clause in the federal Transportation

---

[2] *See also In re NextWave Personal Communications, Inc.,* 244 B.R. 253 (Bankr. S.D.N.Y. 2000), *mandate enforced by*, 217 F.3d 125 (2d Cir. 2000), *cert. denied*, *NextWwave Personal Communications, Inc. v. FCC*, 531 U.S. 1029 (2000). In reversing the Bankruptcy Court and the District Court, and later the Bankruptcy Court on mandamus, the Second Circuit was apparently of the view that the Bankruptcy Code, and therefore Section 362(a) of the Bankruptcy Code, did not apply to the government under the circumstances of that case. *But see, NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130, 151 (D.C. Cir. 2001) ("Thus, contrary to the Commission's argument, and notwithstanding the applicability of the regulatory power exception, section 362's automatic stay *does* apply here") (emphasis in original), *aff'd*, *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003), in which the D.C. Circuit and the Supreme Court, ruling upon the same controversy and facts considered by the Second Circuit, recognized that the automatic stay under Section 362(a) of the Bankruptcy Code did apply to the government.

Payment Act should be construed as creating a statutory scheme under which the amount of the Government's liability in respect of GTR travel cannot be calculated except by reference to, and net of, deductions for past overpayments in respect of credit card travel.

Second, the Government argues that its pre-petition Refund Claim may be deducted from its post-petition liability to Delta on account of GTR travel under the theory of "equitable recoupment."

Neither argument withstands analysis.

**B.    The "calculation of liability" argument based
on case law and the Transportation Payment Act**

The Government's argument is that "the Transportation Act reduces the Government's substantive liability with respect to present and future claims of transportation service providers to the extent of any prior overcharge or overpayment," and that "The Bankruptcy Code does not prevent the Government from relying on statutory provisions that limit its substantive liability regarding debtors' claims."

The simple answer to this argument is that the Transportation Payment Act does no such thing. The statute relied on by the Government in this case, Section 3726(h) of the Transportation Payment Act, 31 U.S.C. § 3726(h), provides that "[p]ayment for transportation ordered [by the Government] but not provided may be recovered by deduction or other means." The Government's liability for its employee travel on Delta is calculated, fixed and paid on a transaction-by-transaction basis in accordance with the City Pair Contract then in force, as described above. Transportation Payment Act § 3726(h) does nothing to change those arrangements. The statute does not provide a method of calculating or otherwise affect the Government's "substantive liability" for air travel. It simply gives the Government a method of collecting refunds for past overpayments by deduction or offset.

The leading Medicare statute case cited to support this argument[3] is *United States v. Consumer Health Services of America, Inc., et al.*, 108 F.3d 390 (D.C. Cir. 1997) ("*Consumer Health*").[4] The statute involved in *Consumer Health* and its progeny was the Medicare statute, 42 U.S.C. § 1395g(a). Consumer Health was a healthcare provider under the Medicare program. In 1984 an audit determined that Consumer Health had been overpaid for 1981-82 to the extent of $81,000. In accordance with applicable regulations and an "agreement . . . for liquidation of the overpayment," the Government (acting through its "fiscal intermediary") began deducting a portion of the $81,000 overpayment from each subsequent payment to Consumer Health. After Consumer Health filed for bankruptcy in 1987, the fiscal intermediary continued the deductions from post-petition amounts payable to Consumer Health. The issue before the Court of Appeals in *Consumer Health* was whether the deduction of pre-petition overpayments from amounts payable to Consumer Health for services provided post-petition constituted the collection of a pre-petition debt in violation of the automatic stay.

The D.C. Circuit Court concluded that the automatic stay was not implicated and that the deduction should not be deemed the unlawful collection of a pre-petition debt because the Medicare statute limited the Government's substantive liability to amounts currently due "with necessary

---

[3] The Government also cites three non-Medicare cases for the uncontroversial statutory proposition that Section 3726(h) of the Transportation Payment Act granted the Government the right to "deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier." *United States v. New York, New Haven & Hartford Railroad Co.*, 355 U.S. 253, 256-57 (1957) (internal citation omitted). *See also*, *American Airlines, Inc. v. Austin*, 75 F.3d 1535 (Fed. Cir. 1996); *United States v. Western Pacific Railroad Co.*, 352 U.S. 59 (1956). As noted above, Delta does not dispute the Government's right to deduct or offset its pre-petition Refund Claims against the Government's pre-petition liability to Delta for GTR travel. These three cases and others like them are not helpful in this controversy because none arose in the context of bankruptcy. The Government has cited no case outside of the Medicare context holding that a pre-petition Government claim for refund can be offset against or deducted from the Government's obligation to pay for post-petition travel or other services.

[4] Although at least one case reached a different conclusion under the Medicare statute, *see University Medical Center v. Sullivan (In re University Medical Center)*, 122 B.R. 919 (E.D. Pa. 1990), *aff'd*, 973 F.2d 1065 (3d Cir. 1992), most courts have followed the analysis or at least the result in *Consumer Health*. *See*, *Holyoke Nursing Home, Inc. v. Health Care Financing Administration (In re Holyoke Nursing Home, Inc.)*, 372 F.3d 1 (1st Cir. 2004); *Slater Health Center, Inc. v. United States, et al. (In re Slater Health Center, Inc.)*, 398 F.3d 98 (1st Cir. 2005). *See also Sims v. United States Dep't of Health and Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008 (9th Cir. 2000).

adjustments on account of previously made overpayments. . . ." 42 U.S. § 1395g(a). Section 1395g(a) provides in full as follows (emphasis supplied):

> Determination of amount. The Secretary shall periodically determine the amount which *should* be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services *shall* be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office [*sic* — Government Accountability Office], from the Federal Hospital Insurance Trust Fund, the amounts so determined, *with necessary adjustments on account of previously made overpayments* or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

As implemented by regulations promulgated by the Department of Health and Human Services, 42 C.F.R. § 413.64, the Medicare statutory scheme in Section 1395g(a) provides for interim payments at least monthly based on the healthcare provider's estimated projected costs, with initial retroactive adjustments made by the provider based on its actual (as opposed to estimated) costs, and final adjustments to be made after the Government fiscal intermediary completes its audit and determination of the actual liability. The key provision is the language in Section 1395g(a) mandating that Medicare providers "*shall be paid*" only "the amounts so determined *with necessary adjustments* on account of previously made overpayments or underpayments." As made clear in the D.C. Circuit Court opinion, to treat the amount of a pre-petition overpayment as merely a pre-petition claim of the Government, to be paid *if at all* in reduced reorganization dollars, would give rise to an irreconcilable conflict with the express requirement of the Medicare statute that medical providers "shall be paid" an estimated amount currently due *after* deduction of "necessary adjustments on account of previously made overpayments."

It is evident from the foregoing that the *Consumer Health* decision is inapposite and provides no support for the Government's position in this proceeding. The *statutory* payment scheme under the Medicare statute is entirely different from the *contractual* arrangements under which the Government purchases air transportation from Delta, and nothing in the Transportation Payment Act changes those arrangements. As shown above, the Medicare statute and implementing regulations require that the amount to be paid by the Government as of any given payment date, *i.e.*, the Government's

"liability," is a combination of the estimate of the amount owed for the current service period net of adjustments up or down for underestimate or overestimate in respect of prior service periods. Because the statutory payment scheme under the Medicare statute requires offsetting of prior over- or under-payments against the estimate for the current service period in order to calculate the current payment amount or liability, the court in *Consumer Health* held that the automatic stay was not implicated.

But no such statutory scheme exists under the Transportation Payment Act. The Government's liability to Delta for Government credit card travel is fixed and determined by contract flight-by-flight and payable monthly just like any other credit card transaction. The Government's liability to Delta for GTR travel is fixed and determined by contract transaction-by-transaction and is payable after audit on or shortly after the Defense Finance and Accounting Service issues an Advice of Payment. The fact that the Government's liability for the amount due in respect of GTR travel is fixed and determined in this manner is reflected in the fact that the DFAS has continued to issue AOPs in the regular course of business since Delta's bankruptcy filing, although the Government has unilaterally refused to pay the AOPs. Nothing in the Transportation Payment Act effects or affects the contractual methods for determining liability and payment which now govern and have long governed Delta and the Government as vendor and vendee of air travel service. As Delta aptly expressed it in its Reply Memorandum, all the Transportation Payment Act does in Section 3726(h) is "establish[ ] a collection tool for the recovery of overpayment for old transactions where the purchasing employee or agency failed to follow their own regulations with respect to obtaining refunds."

The fact that Transportation Payment Act Section 3726(h) gives the Government the right to deduct or set off refund claims against amounts owed to transportation service providers is no different in substance than the right of any creditor under non-bankruptcy law to set off claims and liabilities *vis a vis* its debtor/obligee. And the Government as creditor in respect of a refund claim against an airline is no different from a non-government creditor of the debtor-airline — both are subject to the provisions of the automatic stay and Section 553 which are applicable to all creditors, including the Government, and

which effectively limit the right of offset existing under non-bankruptcy law to offsetting pre-petition claims and liabilities.

The Supreme Court has recently had occasion to reaffirm the principle that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." *Howard Delivery Service, Inc. v. Zurich American Insurance Co.*, ___ U.S. ___, 126 S. Ct. 2105, 2109 (2006) (citations omitted). "The theme of the Bankruptcy Act is 'equality of distribution,' . . . and if one claimant is to be preferred over others, the purpose should be clear from the statute." *Id.* at 2116 (citations omitted). With few exceptions "preferential treatment of a class of creditors is in order only when clearly authorized by Congress." *Id.* at 2109. A number of provisions in the Code provide exceptions to the general rule that similarly situated creditors should be treated equally. But whatever the special treatment, "provisions allowing preferences must be tightly construed." *Id*. at 2116. *See also Nathanson v. NLRB*, 344 U.S. 25, 29 (1952).

The Government argues, in substance, that Transportation Payment Act Section 3726(h) should be deemed to override or trump the Bankruptcy Code and thereby nullify Sections 362(a) and 553 when the Government is the creditor. But nothing in the Bankruptcy Code and nothing in the Transportation Payment Act expressly states or even suggests that the Government as creditor should be treated differently under the Bankruptcy Code than any other creditor.

Courts have consistently referred to the Bankruptcy Code to provide direction for the significance of a term found in other federal statutes. *See CF&I Fabricators of Utah, Inc., et al. (I)*, 518 U.S. 213, 219 (1996) (finding it significant for the purposes of bankruptcy law that Congress included no reference in the Bankruptcy Code to the explicitly bankruptcy referential ERISA definition of "tax," the Court stated, "[h]ere and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes."). "To the extent a federal non-bankruptcy statute purports to affect priorities within a bankruptcy case, that statute is preempted by the more specific provisions in the Code." 4 COLLIER ON BANKRUPTCY ¶ 507.02, P. 507-19 (15th ed. rev. 2006). "[T]he key to whether a statutory provision is 'explicit' in this context is

- 13 -

06-01259-cgm    Doc 26    Filed 11/03/06    Entered 11/03/06 17:09:11    Main Document
Pg 14 of 20

whether the *Bankruptcy Code* adopts and makes specific reference to the provisions of the other law." *In re CF&I Fabricators of Utah Inc. (II)*, 150 F.3d 1293, 1297 (10th Cir. 1998), *cert. denied*, *sub nom. Pension Benefit Guaranty Corp. v. CF&I Fabricators of Utah, Inc.*, 526 U.S. 1145 (1999) (citation omitted) (emphasis in original). "Any doubt concerning the appropriate characterization . . . is best resolved in accordance with the Bankruptcy Code's equal distribution aim." *Howard Delivery*, 126 S. Ct. at 2116 (rejecting an expanded interpretation of Section 507(a)(5) of the Code by holding that priority status awarded to wages, salaries, and commissions under Section 507(a)(4) and bargained for fringe benefits under Section 507(a)(5) do not include an employer's unpaid obligation to pay worker's compensation insurance). *See also In re CF&I Fabricators of Utah Inc. (II)*, 150 F.3d at 1297 (rejecting PBGC claim that ERISA § 4068(c) defines a "tax" for purposes of tax priority under the Bankruptcy Code despite the explicit language of Section 4068(c) which states that "in a case under Title 11 or in insolvency proceedings, the lien imposed under subsection (a) of this section shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11") (citation omitted).

The Government argues that the Court must look behind the plain language of the statute to the policy objectives and intent of Congress. But the policy objectives behind the Bankruptcy Code are no less important. The plain fact is that neither the Bankruptcy Code nor the Transportation Payment Act reveals a Congressional intent to exempt the Government as a creditor from the fundamental mandates of the Bankruptcy Code embodied in the automatic stay and Section 553. Without any indication from Congress in the plain language of either statute, the alleged but unexpressed policy or intent behind one cannot override the plain language of the other.

To summarize, the Government's argument based on the *Consumer Health* line of cases and the Medicare statute cannot be sustained on the facts here. The Transportation Payment Act does not create a payment scheme under which the Government's liability to pay for transportation services must be calculated net of refunds due for services paid for but not used months or years before. The Government's liability is now and at all relevant times has been calculated and paid on a transaction-by-

transaction basis, entirely without regard to Delta's independent duty to refund monies received for unused air tickets. Transportation Payment Act Section 3726(h) certainly does grant the Government a collection remedy by setoff. But that setoff right is subject to the same constraints under Section 362(a)(3) and (6) and Section 553 of the Bankruptcy Code as the setoff rights of any other creditor.

C. **The "equitable recoupment" argument**

The words "to recoup" or "recoupment" are sometimes used colloquially by lay persons, lawyers and even courts as synonymous with "to set off" or "setoff." But when used as terms of art with legal consequences, recoupment and setoff are quite different.

In legal parlance, the right of setoff refers to a situation where two parties have mutual claims against and debts owing to each other. Setoff rights may arise from the entire relationship of the parties and are not limited to a single transaction. Thus, the claims and debts can arise from disparate, unrelated transactions, contracts or events so long as the claims and debts are mutual as between the two parties. *See Meyer Medical Physicians Group, Ltd. v. Health Care Service Corp. (In re Meyer Medical Physicians Group, Ltd.)*, 385 F.3d 1039, 1042 (7th Cir. 2004) ("Whether or not the debt arose from different transactions does not affect HCSC's right to a setoff because the debt was in the same right and same capacity.") (citations omitted); *Sims v. U.S. Dep't of Health and Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000) ("These debts may arise either from separate transactions or a single transaction but must be incurred prior to the filing of a bankruptcy petition.") (citations omitted); 5 COLLIER ON BANKRUPTCY ¶ 553.10, P. 553-99 (15th ed. rev. 2006) ("Moreover, rights of setoff most often arise between obligations stemming from separate transactions or events, although setoff is certainly permissible with respect to mutual, prepetition obligations arising out of the same transaction.") (citations omitted).

The concept of recoupment is far narrower. The right of recoupment arises only in the context of a single contract or a series of transactions constituting a single, integrated transaction or contract.

> The pertinent distinction between a setoff and a recoupment is whether the debt owed the creditor . . . arose out of the "same transaction" as the debt the creditor owes the debtor. For example, if A were to buy a truck worth $1000 from B, but A finds that he must expend $100 to put the truck back into working condition, A might send B a check for only $900, rather than pay B $1000 and await a $100 refund from B. The $100 A recovers by deducting it from the amount he owes B constitutes a recoupment because the reciprocal obligations arose out of the same transaction, *viz.*, the purchase-sale of the truck. Had B filed for bankruptcy protection, A could recoup the $100 prepetition debt from B without violating the automatic stay because "it would be inequitable for [B] to enjoy the benefits of that transaction without also meeting its obligations."

*Holyoke Nursing Home, Inc. v. Healthcare Financing Administration (In re Holyoke Nursing Home, Inc.)*, 372 F.3d 1, 3 (1st Cir. 2004) (citation omitted). "[T]he typical situation in which equitable recoupment can be invoked involves a credit and debt arising out of a transaction *for the same goods or services*." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1402-03 (9th Cir. 1996) (quoting *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir. 1992)) (emphasis in original).

Courts have applied one of two primary approaches in determining whether the obligations at issue meet the "same transaction" requirement. One approach is the "logical relationship test" articulated by the Supreme Court in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926) ("Transaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.") (internal quotations omitted). *See also Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d at 1402-03. The second approach, adopted by the Second Circuit, incorporates a more restrictive "single integrated transaction test." *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d Cir. 2002) ("Recoupment may only be applied in bankruptcy where 'both debts . . . arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.'") (citing *Malinowski v. New York State Dep't of Labor (In re Malinowski)*, 156 F.3d 131,

133 (2d Cir. 1998)) (quoting *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.1992)) (emphasis in *Malinowski* ). *See also Anes v. Dehart (In re Anes)*, 195 F.3d 177, 182-83 (3d Cir. 1999); *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.*), 82 F.3d 956, 959-61 (10th Cir. 1996); *United States ex rel. United States Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 623 (8th Cir. 1994), *reh'g denied*, 1994 U.S. App. LEXIS 30564 (8th Cir. Nov. 2, 1994).  The main difference in the two approaches lies in the degree of "interconnectedness" necessary between the obligations at issue. 5 COLLIER ON BANKRUPTCY ¶ 553.10[1], P. 553-104 (15th ed. rev. 2006).

The concept of setoff is specifically dealt with in Section 553 of the Bankruptcy Code. For present purposes it is sufficient to observe that Section 553 authorizes setoff to the extent permitted under non-bankruptcy law, but only to the extent of pre-petition debt and pre-petition liabilities. The Bankruptcy Code does not permit a creditor to set off a pre-petition claim against a post-petition liability owed to the debtor.  *See Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1538 (1st Cir. 1990) (prepetition obligation based on arbitration award may not be offset against postpetition claim); 3 NORTON BANKR. L. & P. 2d § 63:4, Part 11, § 553 (September 2006) ("where a debtor files for reorganization under Chapter 11, and thereafter performs work for a creditor holding a prepetition claim, the creditor may not set off its postpetition indebtedness against its prepetition claims") (footnote omitted).  *See also Aetna Casualty & Surety Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772, 781 (2d Cir. 1996) ("This provision, giving priority to IRS setoffs over other government setoffs, cannot, however, thwart the requirements of 11 U.S.C. § 553, that to be preserved in bankruptcy a setoff must involve pre-petition mutual debts."); *IRS v. Luongo (In re Luongo)*, 259 F.3d 323, 334 (5th Cir. 2001) ("Creditors are limited by the terms of § 553 to offsetting debts owed the debtor prepetition.") (citation omitted); *In re TLC Hospitals, Inc.*, 224 F.3d at 1011 ("Under setoff, mutual debts cancel each other.  These debts may arise either from separate transactions or a single transaction but must be incurred prior to the filing of a bankruptcy petition." (citing 5 COLLIER ON BANKRUPTCY ¶ 553.10, P. 553-100 and 11 U.S.C. § 553(a)); *In re Peterson Distributing, Inc.*, 82 F.3d at 959 ("Setoff, codified in 11 U.S.C. § 553(a), gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor'

provided that both debts arose before commencement of the bankruptcy action and are in fact mutual.") (citation omitted).

The terms "recoup" and "recoupment" are not addressed in the Bankruptcy Code. The right of recoupment in bankruptcy is judge-made law, *see In re Malinowski*, 156 F.3d at 133 ("Recoupment, in contrast, comes into bankruptcy law through the common law, rather than by statute") (citation omitted), and under Second Circuit law it is strictly limited by the "single integrated transaction" test. *See, e.g., Westinghouse Credit Corp.* v. D'Urso, 278 F.3d 138, 147 (2d Cir. 2002) ("Recoupment may only be applied in bankruptcy where both debts . . . arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.") (citations and internal quotations omitted) (emphasis in original); *In re Malinowski*, 156 F.3d at 133 (same); *Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.*), 289 B.R. 548, 562 (Bankr. S.D.N.Y. 2003) (same).

The Second Circuit requires more than a "'mere logical relationship'. . . to bring . . . mutual debts within the 'same transaction.'" *BNY Fin. Corp. v. Masterwear Corp. (In re Masterwear Corp.)*, 229 B.R. 301, 311 (Bankr. S.D.N.Y. 1999) (citation omitted). In other words, "[w]hen the circumstances that gave rise to the credit and those giving rise to the creditor's obligation to the debtor do not result from a set of reciprocal contractual obligations or from the same set of facts, they are not part of the same transaction." *In re Malinowski*, 156 F.3d at 134.

The Government's attempt to deduct from its post-petition liability in respect of GTR travel services claims for refund arising from unused airline tickets purchased by Government travel card years before Delta's bankruptcy filing, under different and long-expired City Pair Contracts, cannot possibly be said to meet the single integrated transaction test.

The theory under which the judicially-created concept of equitable recoupment avoids the constraints of Sections 362(a) and 553 of the Bankruptcy Code is that the money to be recouped never becomes part of the debtor's bankruptcy estate, *see In re Malinowski*, 156 F.3d at 133 ("The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property.") (citing

*Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1035 (3d Cir.1995) and *United Structures of America, Inc., et al. v. G.R.G. Eng'g, S.E., et al.*, 9 F.3d 996, 999 (1st Cir. 1993)); *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 502 (S.D.N.Y. 2004) ("Recoupment, on the other hand, is not subject to the automatic stay provisions of 11 U.S.C. § 362, 'because funds subject to recoupment are not the debtor's property.'") (citations omitted), and it would be inequitable to permit the debtor to retain the funds to be recouped and at the same time continue to enjoy the benefits of the contract or single integrated transaction.

That theory does not fit the facts here. When a Government employee purchased a round trip ticket between Atlanta and San Francisco by Government travel card in accordance with the Delta City Pair Contract in effect in 2001, that constituted a completed transaction for which Delta was paid by the bank or credit card company within a matter of weeks or months in the ordinary course of business. The money which was paid on account of that transaction immediately became Delta's property, and there was and is nothing inequitable about Delta's retaining that property.

If a ticket purchased and paid for by a Government employee in 2001 expired unused in whole or in part, the Government then became entitled to a refund of the amount paid that was allocated to the unused portion of the ticket. The Government thereby became a creditor for the amount of the refund. Under Transportation Payment Act Section 3726(h) the Government has the right to collect that refund by deduction from or offset against amounts owed to the airline within ten years of the date of the unused ticket.

But it is not inequitable to treat the Government like all other creditors, who are barred by Bankruptcy Code Sections 362(a) and 553 from offsetting pre-petition claims against post-petition liabilities. Indeed, the very purpose of these Bankruptcy Code provisions, among many others, is to insure equal treatment of all creditors so that no creditor, not even the Government, obtains an unfair advantage over others.

As recently reaffirmed by the Supreme Court in *Howard Delivery Service*, discussed and quoted above, equal treatment of creditors is a central objective of bankruptcy jurisprudence. To grant the Government the setoff right here at issue would not only be inequitable, but unlawful as well.

### **Conclusion**

For the foregoing reasons, Delta is entitled to a declaratory judgment for the relief sought in the complaint in this adversary proceeding. Counsel for Delta will promptly submit an appropriate order and judgment satisfactory in form to counsel for the Government, without prejudice to the Government's right to appeal from the substance of this ruling.

Dated: White Plains, NY
       November 3, 2006

                                                   /s/Adlai S. Hardin, Jr.
                                                         U.S.B.J.